AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Western District of Washington

FILED _____ LODGED
RECEIVED

**DEC 0 4 2018**

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY                                    DEPUTY

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| The location more particularly described in Attachment A | ) |
| | ) |

Case No. **MJ18-5279**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A,

located in the _____ Western _____ District of _____ Washington _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841(a)(1), 843(b), 846, and 18 USC 924(c), 1956, and 1957 | Drug trafficking conspiracy and related offenses, money laundering and related offenses. |

The application is based on these facts:

See Attached Affidavit of DEA Special Agent Jeremy Tan.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Jeremy Tan, DEA Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 12/04/2018 _____

*Judge's signature*

City and state:  Tacoma, Washington

Theresa L. Fricke, United States Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

STATE OF WASHINGTON    )

                          )      ss

COUNTY OF PIERCE       )

    I, Jeremy T. Tan, Special Agent, Drug Enforcement Administration (DEA), United States Department of Justice, being first duly sworn on oath, depose and state:

## I.   INTRODUCTION AND AGENT BACKGROUND

    1.     I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

    2.     I am a Special Agent with the Drug Enforcement Administration (DEA) and have been since July 2017.  My current assignment is to the Tacoma Resident Office. Prior to my employment with the DEA, I was a Ranger Fire Team Leader for the United States Army, from February 2012 to October 2016.

    3.     My training and experience includes, but is not limited to, a 20-week course at the DEA academy in Quantico, Virginia.  At the DEA academy, I was trained in all aspects of conducting narcotics investigations to include debriefing defendants, witnesses, and informants; conducting surveillance; executing search warrants; conducting controlled deliveries; utilizing law enforcement, open source, and social media databases; and seizing narcotics and narcotics-related assets.  I have also acquired knowledge and information about the illegal drug trade and the various means and methods by which it is furthered from formal and informal training, other law enforcement officers and investigators, informants, individuals I have interviewed, and from my participation in investigations.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

## II.    PURPOSE OF AFFIDAVIT

4.      This Affidavit is submitted in support of an application to search the following location, as further described in Attachment A for evidence, fruits and instrumentalities of drug trafficking and related money laundering crimes committed by the drug trafficking organization (DTO) referred to herein as the CASTRO DTO, in violation of Title 21, United States Code, Sections 841(a)(1), 843(b), 846, and 952, and Title 18, United States Code, Sections 924(c), 1956, and 1957, as further described in Attachment B:

- Residence of Andrew Cain and Brittany Renae KRISTOVICH:  **Holiday Inn Express and Suites, 2515 196th St. Southwest, Room 210, Lynnwood, Washington.**

## III.    INVESTIGATION OVERVIEW

5.      Agents are investigating a drug trafficking organization (DTO) in Western Washington they believe Juan and Florencio Castro Valenzuela and their associates, including Jesus Rene SARMIENTO Valenzuela, Jorge VALENZUELA Armenta, Arturo FRIAS Ceballos, Carlos Eduardo LOPEZ Hernandez, Juan Jose HIGUERA Gonzalez, Jaime HEREDIA Castro, Daniel Osvaldo ROCHA Lopez, Juan AVILES Berrelleza, Manuel LOYA Soto (aka Jesus Loya Soto), Leonel Sillas Berrelleza, Oscar Humberto CARRILLO Salcedo, Gregory WERBER, Hector Manuel URIAS Moreno, Jose RANGEL Ortega, Cesar LOYA, Carlos Alejandro CASTRO Perez, Cindy SOLTERO Jimenez, Michael John SCOTT, Esther La Rena SCOTT, Gerald Keith RIGGINS, Julian Gauge ORDONEZ, Monique GREEN, Rolando ESPINDOLA, Jessica JOHNSON, Emmanuel REYES Perez, Michael SURYAN, Karen SURYAN, Orlando BARAJAS, Jose VELASCO, Brian LIVELY, Alek James BAUMGARTNER, Andrew Cain KRISTOVICH, Brittany Renae KRISTOVICH, Bernardo HIGUERA Guerrero, Uriel ZELAYA, Omar VALTIERRA,  Jerry Austin RODRIGUEZ Jaime, Joshua MENDIOLA, Allex HUBLY, David HUBLY, Megan CHAPMAN,  Charles JOSLYN, Shalesha HUDSON, Tim CRAWFORD, Kurtis NEMEYER,  Lindsay NEMEYER,

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  Natasha DJORDJEVIC, Corey RILEY, Julia CAMMEL, Larry SWEITZER, Oscar
2  CARRILLO, Gregory WERBER, Frances JUAREZ Castillo, Agustin JUAREZ Castillo,
3  Edgar CABRERA, Constantino MARES Garcia, and others known and unknown, are
4  operating.  This organization is referred to as the CASTRO DTO and is predominantly
5  involved in the trafficking of high-purity heroin, counterfeit oxycodone pills, and
6  methamphetamine.  This investigation started as a local drug investigation by the
7  Bremerton Police Department in August 2017, and has been expanding in scope ever
8  since that time.

9      6.     During this extensive investigation, agents have conducted multiple
10  controlled and undercover purchases of heroin (totaling around 500 grams) using a
11  confidential source and an undercover agent; conducted hundreds of hours of physical
12  and electronic surveillance; installed tracking devices on several target vehicles and
13  tracking devices/pen registers on several target telephones; used mounted surveillance
14  cameras to watch the activities at several significant DTO locations; executed several
15  search warrants on Facebook accounts used by the CASTROs to aid in their distribution
16  of heroin in Western Washington; identified several high-level international drug
17  traffickers in Sinaloa, Mexico, with direct ties to Western Washington; executed a
18  delayed-notice search warrant at a DTO stash apartment and a similar delayed-noticed
19  search warrant at two DTO storage units; and have obtained authorization to intercept
20  wire and electronic communications over several different telephones used by multiple
21  members of the CASTRO DTO in Western Washington.

22          **IV.   SOURCES OF INFORMATION**

23      7.     I have obtained the facts set forth in this Affidavit through my personal
24  participation in this investigation, and from my review of intercepted calls, oral and
25  written reports of other law enforcement officers participating in this and related
26  investigations, and records, documents, and other evidence obtained during this
27  investigation.  Since this Affidavit is being submitted for the limited purpose of obtaining
28  search warrants for the residences and vehicles identified above and in Attachments A

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   and A1 to A89, I have set forth only the facts that I believe are necessary to establish

2   probable cause for these warrants.

3        8.    This Affidavit also sets forth facts and information obtained from

4   intercepted communications that were conducted primarily in the Spanish language.

5   Spanish-speaking monitors documented the content of these communications and

6   prepared line sheets summarizing them.  The intercepted communications discussed

7   herein include the summaries of pertinent portions as prepared by the monitors, and are

8   not necessarily the entire conversations between the parties involved.

9        9.    Through my training and experience, I know that individuals involved in

10   the distribution of controlled substances and other criminal activity often use coded

11   words and vague terms when referring to illegal activity.  When such words were used in

12   the instant investigation, I used this training and experience, along with facts obtained

13   throughout the entirety of this investigation, to include what I believe to be an accurate

14   translation of these coded words and vague references in parentheses throughout this

15   Affidavit.

16        10.   As part of the instant investigation, investigators received information

17   about the CASTRO DTO from two confidential sources as described below.

18        11.   Confidential Source One (CS1) agreed to cooperate with law enforcement

19   in 2017, in exchange for judicial considerations.  CS1 was arrested by members of the

20   Bremerton Police Department Special Operations Group (SOG) for his/her involvement

21   in drug trafficking.  CS1 cooperated with SOG and provided them with information about

22   a group of Mexican drug traffickers who were distributing large amounts of heroin in the

23   Puget Sound region.  CS1 advised SOG that he/she had been selling various controlled

24   substances for several years and had been in contact with several of the people within this

25   group of Mexican drug traffickers (the CASTRO DTO).  CS1 spoke to SOG about a

26   now-prominent member of the DTO whom the CS knew as "Juan" or "Jose."  The CS

27   believed the individual he/she knew as "Juan/Jose" was the local leader of the DTO at the

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  time when "Juan/Jose" and the CS had originally met several years ago, and believed

2  "Juan/Jose" was more recently promoted to a larger role in the DTO.

3      12.    CS1 told members of SOG that "Juan/Jose" used Facebook to communicate

4  with the CS and many other heroin distributors. Bremerton Police Detective (Det.)

5  Jordan Ejde located a Facebook account under the name of "Juan Andres Castro

6  Valenzuela" with which CS1 and other local suspected drug dealers were associated.

7  Det. Ejde questioned CS1 about the account and CS1 confirmed "Juan Andres Castro

8  Valenzuela" was the male whom he/she referred to as "Juan" or "Jose." CS1 also

9  showed Det. Ejde messages confirming that Juan CASTRO was in contact with CS1,

10  using the account in his (Juan Castro's) name. According to CS1 and the Facebook data

11  he/she provided, he/she has been talking to Juan Castro via Facebook Messenger for

12  purposes of making drug transactions since the summer of 2016.

13      13.    A review of CS1's Facebook account showed Juan Castro also contacted

14  CS1 from additional Facebook accounts under the names of "Rebeca Spencer," "Annel

15  Baker," and "Katherine Thomas." A review of CS1's phone showed Juan Castro

16  additionally used Mexican phone numbers 52-668-199-4039 (TT1), 52-668-248-4230,

17  52-668-225-5890, and 52-668-199-5533 (TT2) to communicate with CS1 via text

18  message and voice calls. The "Katherine Thomas" Facebook account and TT1 were Juan

19  Castro's most current methods of drug related communications with CS1 at the time

20  he/she provided the initial information to SOG.

21      14.    Utilizing CS1, SOG conducted six controlled purchases of suspected heroin

22  from Juan Castro through DTO courier Jesus Rene SARMIENTO Valenzuela (aka

23  "Miguel"), totaling approximately 90.4 grams. Prior to and after each controlled

24  purchase of heroin, detectives searched CS1 and his/her vehicle, and provided CS1 with

25  pre-recorded SOG funds to make each purchase. During the course of each controlled

26  purchase, detectives maintained surveillance on CS1. After each purchase, detectives

27  tested the suspected heroin using a NIK test kit with presumptive positive results for the

28  presence of heroin, and then processed the heroin according to SOG's policies and

AFFIDAVIT OF JEREMY TAN - 5

1   procedures.  For the second through sixth controlled purchases, detectives recorded the
2   buys with a covert surveillance camera.

3       15.     SOG and DEA began their joint investigation into the CASTRO DTO in
4   the fall of 2017 and used CS1 to make another (seventh) controlled purchase of heroin
5   from the CASTRO DTO.  CS1 continued to provide agents with updated information on
6   the DTO's communications methods/platforms and, as detailed later in this Affidavit,
7   CS1 was able to introduce an undercover DEA agent (UC) to the CASTRO DTO towards
8   the end of 2017.

9       16.     Unfortunately, CS1 was battling heroin addiction for most of the time
10  he/she was working with agents.  After the seventh controlled purchase with CS1 (the
11  first in which the DEA was involved), which took place toward the end of October 2017,
12  agents provided CS1 with cash reimbursement for his/her expenses after the purchase
13  was completed.  After this, CS1 and agents parted ways; agents assumed CS1 would
14  travel back to his/her residence.  Unfortunately, agents conducting surveillance of the
15  CASTRO DTO couriers after the controlled purchase noticed CS1 returned to meet with
16  one of the couriers and seemed to conduct another, unsanctioned, drug transaction.
17  Agents later questioned CS1 about this encounter and he/she was immediately truthful.
18  CS1 told agents he/she had gone back to obtain a user amount of heroin.  CS1 said being
19  in the presence of heroin during the controlled purchase was enough of a temptation to
20  ignite CS1's urge to use the drug personally.  CS1 also told agents how he/she had
21  previously taken (and later used) small portions of the heroin from some of the controlled
22  purchases SOG had done prior to DEA's involvement.  Obviously, such behavior is
23  against law enforcement policies regarding confidential sources and their use in an
24  investigation.

25      17.     Agents spoke with CS1 about the dangers he/she faced by committing such
26  crimes while working for law enforcement.  After this discussion, CS1 told agents he/she
27  wanted to continue to work for law enforcement (if allowed); he/she said it was very
28  important to CS1 that he/she help take the CASTRO DTO's drugs off the streets.  CS1

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  described his/her addiction to heroin as one of the strongest mental struggles a person

2  would ever have to deal with. From my training and experience, I know CS1's

3  statements regarding the struggle against heroin addiction to be true. CS1 told agents

4  he/she would be willing to enter into a drug rehabilitation program or do whatever it took

5  to get past this addiction and help law enforcement take down the CASTRO DTO while

6  doing so. Together, agents and CS1 developed a method of helping CS1 to combat

7  his/her addiction while helping the investigation.

8        18.    Agents provided CS1 with access to drug treatment programs and got CS1

9  enrolled in a rehabilitation center; they even arranged for atypical expense

10  reimbursements for CS1. Rather than cash reimbursement for expenses incurred during

11  government operations, agents provided CS1 with food cards or gasoline—things that

12  were not readily convertible into cash. Agents did so at the request of CS1, so he/she

13  would not be tempted to purchase drugs with any excess money. These methods worked

14  for a time.

15        19.    CS1 successfully completed several months of his/her rehabilitation

16  program before staff asked CS1 to leave due to his/her attitude problems and problems

17  with other rehabilitation patients. CS1 continued to help agents by providing information

18  about the DTO and helping to build the UC's reputation. However, CS1 relapsed into

19  heroin use in the spring of 2018. This time, CS1 quite rapidly spiraled downward into an

20  almost paranoid and delusional state. Agents determined they could no longer use CS1

21  for any investigative purposes, but tried once again to get CS1 some help with his/her

22  drug problem. Unfortunately, CS1 was not as amenable on this occasion and shunned

23  agents' attempts at providing assistance. In May 2018, local police arrested CS1 and

24  charged him/her with residential burglary (felony) and driving with a suspended or

25  revoked license (misdemeanor). SOG deactivated CS1 in May 2018 due to CS1's

26  substance abuse issues. However, agents found CS1's information to be reliable during

27  the time agents utilized him/her to gather information.

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1       20.    CS1's criminal history includes a felony conviction for

2  Manufacture/Deliver a Schedule I/II Narcotic in 2013, gross misdemeanor convictions

3  for Fourth Degree Assault in 2015 and Third Degree Malicious Mischief in 2011, as well

4  as misdemeanor convictions for Third Degree Driving With a Suspended or Revoked

5  License in 2018 and 2008, Indecent Exposure in 2013, and Third Degree Malicious

6  Mischief in 2006.

7       21.    Confidential Source Two (CS2) initially agreed to cooperate with law

8  enforcement in exchange for charging considerations, i.e., not being charged.  CS2 began

9  working with members of the Kent Police Department (KPD) in November 2017.  CS2

10  completed this initial arrangement with KPD successfully and has since been working

11  with members of KPD for monetary gain.  CS2 has completed multiple controlled

12  purchases with KPD; during each purchase, CS2 was searched prior to and after the

13  transaction for contraband with negative results, and in each case CS2 returned with the

14  anticipated quantity of drugs.  In the past two years, prior to working with KPD, CS2 has

15  successfully worked with the Seattle Police Department (two controlled purchases) and

16  the King County Sherriff's Office (one controlled purchase).  Most recently, CS2 has

17  provided KPD with information about a DTO operating in King County, Washington,

18  and has conducted controlled purchases from this DTO.

19       22.    During the second week of December 2017, the KPD's Special

20  Investigation Unit (SIU) completed the first controlled purchase from a drug trafficker

21  known to them at the time as "Pedro."  Pedro was later identified in SIU's investigation

22  as Pedro Vasquez Juarez and his residential address was identified through physical and

23  electronic surveillance as a location in Auburn, Washington.  CS2 told SIU members

24  Vasquez was a "runner" (i.e., drug/money courier) for a local drug trafficking

25  organization.  The King County Sheriff's Office, who also had knowledge of the group

26  and various details about this organization, later corroborated this information.

27       23.    CS2 sent a text message to 559-514-3664 (Vasquez's phone at that time) in

28  presence of SIU members, requesting an amount of heroin known to investigators.  About

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  ten minutes later, Vasquez responded and agreed to sell drugs to CS2. SIU subsequently

2  conducted the controlled purchase with CS2 (which took about 30 seconds) and

3  confirmed Vasquez was the deliveryman for that transaction. The substance Vasquez

4  delivered weighed 24.89 gross grams with packaging and field-tested positive for the

5  presence of heroin.

6       24.    During the third week of January 2018, KPD used CS2 to conduct a second

7  controlled purchase from Vasquez. SIU Detective Elizabeth Yagi monitored CS2 as CS2

8  placed text messages and a phone call to 559-514-3664, Vasquez's phone number at that

9  time. From these communications, Vasquez agreed to conduct a drug transaction with

10  CS2. Vasquez and CS2 conducted another drug transaction (while under surveillance by

11  SIU). The substance obtained by CS2 was later found to weigh 11.16 gross grams with

12  packaging and field-tested positive for the presence of heroin.

13       25.    Later in January 2018, SIU noticed service to Vasquez's phone (559-514-

14  3664) had been discontinued. CS2 advised SIU Vasquez had indeed switched to another

15  phone number, 206-380-2481. Upon looking through communications on CS2's phone

16  with Vasquez's new number (206-380-2481), SIU noted there was at least one

17  conversation they recognized, through training and experience, to be drug-related in

18  nature; CS2 confirmed this suspicion. DEA agents later provided information to SIU that

19  further corroborated CS2's information.

20       26.    Agents in this investigation initially identified 206-380-2481 as a relevant

21  phone number through telephone tolls analysis of CASTRO DTO phones (namely Daniel

22  Osvaldo ROCHA Lopez's phones, including TT24). Agents believed 206-380-2481 was

23  a likely criminal associate of ROCHA's based on their communications history. Agents

24  searched this phone number through law enforcement databases and discovered SIU's

25  ongoing investigation into Vasquez. Agents served an administrative subpoena on 206-

26  380-2481's service provider, Sprint, and found the phone is actually subscribed to Pedro

27  Vasquez at his known address in Auburn, Washington. Service to this device began on

28  July 28, 2017. Agents provided this information to SIU.

AFFIDAVIT OF JEREMY TAN - 9

1    27.    Agents continued their telephone tolls analysis of TT24 and other CASTRO

2  DTO phones throughout June and into July 2018, and discovered another top contact of

3  TT24: 206-841-5082. Agents served an administrative subpoena on 206-841-5082's

4  service provider, which was also Sprint, and found the phone was *also* subscribed to

5  Pedro Vasquez —though this phone number was registered at a default, prepaid address

6  for Sprint phones. Service to this device began on June 12, 2018. Though ROCHA had

7  communicated with Vasquez's prior numbers, he had communicated most recently (at

8  that time) with Vasquez's newest phone number (206-841-5082). Agents provided this

9  additional information to SIU and they corroborated agents' beliefs based on information

10  obtained through their independent investigation.

11    28.    I believe the information CS2 has provided to KPD SIU about Pedro

12  Vasquez is accurate and reliable.

13    29.    CS2 has criminal convictions that span five states, and include Possession

14  of Stolen Property; Violation of the Uniform Controlled Substances Act; Receiving

15  Stolen Property; Fraud; two counts of Aggravated Theft; felony Possession of Drugs;

16  Failure to Comply with Police; Drug Possession; Receiving Stolen Property; felony

17  Grand Theft; Conspiracy to Commit Grand Theft Auto; Delivery of Controlled

18  Substance; Controlled Substance Delivery (Marijuana); felony Theft; felony Escape;

19  three counts of Theft by False Promise; and felony Theft.

20               **V.    SUMMARY OF INVESTIGATION**

21    30.    During the instant investigation, which has spanned over a year,

22  investigators have identified several locations in Western Washington that are believed to

23  be used in the facilitation of the CASTRO DTO's drug trafficking and money laundering

24  activities. The following summary of this investigation is offered in support of my belief

25  that probable cause exists to believe that these residences, including outbuildings and

26  vehicles located within the curtilage of same, contain evidence, fruits and/or

27  instrumentalities of drug trafficking and money laundering crimes committed by the

28

AFFIDAVIT OF JEREMY TAN - 10

1  CASTRO DTO in violation of Title 21, United States Code, Sections 841(a)(1), 843(b),
2  846, and 952, and Title 18, United States Code, Sections 924(c), 1956, and 1957.

3       31.    The intercepted calls, surveillance observations, real-time tracking data,
4  confidential source information, and enforcement activities described herein do not
5  encompass all of the information collected concerning the instant investigation. Rather, I
6  have set forth only the facts that I believe are essential to establish the necessary
7  foundation for the issuance of the requested search warrants. As such, I have included in
8  this Affidavit several examples of drug trafficking activity as they relate to each location,
9  which is highlighted in bold text. Some of these examples also encompass drug
10 trafficking activity as it relates to specific vehicles that investigators seek authorization to
11 search. Where those vehicles are discussed in this Affidavit, the description
12 (color/make/model) and license plate of the respective vehicle and/or its Target Vehicle
13 number (if one was assigned) is highlighted in bold text. The information and examples
14 below are only a representative sample of the evidence gathered during the entire
15 investigation.

16         a.  ***Bremerton Police Develop a Confidential Source***

17       32.    During the month of August 2017, the Bremerton Police Department
18 Special Operations Group (SOG) was investigating a suspected local heroin dealer
19 reportedly purchasing heroin from a Hispanic individual in the Snohomish and King
20 County areas. SOG conducted controlled buys from the local dealer, and eventually
21 detained him/her during a traffic stop. During the stop, detectives discovered a large
22 amount of cash, which the dealer claimed he/she owed as a drug "front" to a Mexican
23 drug trafficking organization (DTO). The dealer then agreed to cooperate with law
24 enforcement; SOG signed up the dealer as Confidential Source 1 (CS1). I have provided
25 details regarding SOG's initial interactions with CS1 in Section IV of this Affidavit.

26       33.    As described in Section IV, utilizing CS1, SOG conducted six controlled
27 purchases of suspected heroin from CASTRO through Jesus Rene SARMIENTO
28

1    Valenzuela, totaling approximately 90.4 gross grams.[1]   The first two of these buys

2    occurred in August 2017, the next three were in September 2017, and the last one took

3    place at the beginning of October 2017.   During these controlled purchases investigators

4    observed SARMIENTO driving a red Volkswagen Jetta bearing Washington plate

5    BFX7429 (Target Vehicle 1 or TV1).   After the second controlled buy, investigators

6    observed SARMIENTO conduct the transaction in the parking lot of Soltero's Market

7    Mexican Store, 24202 104th Ave. SE, Unit 104, Kent, Washington.   Investigators then

8    observed SARMIENTO walk into Soltero's Market Mexican Store, 24202 104th Ave.

9    SE, Unit 104, Kent, Washington, following the completion of the deal.   Agents also saw

10   SARMIENTO walking into Soltero's Market Mexican Store, 24202 104th Ave. SE, Unit

11   104, Kent, Washington, just prior to the fifth controlled buy, which occurred in the

12   parking lot of Soltero's Market.

13            b.      ***SOG and DEA Begin their Joint Investigation into the CASTRO***

14                    ***DTO***

15            34.      After uncovering the Facebook information provided by CS1 with its

16   seemingly direct connection to Mexico, Det. Ejde began working with Special Agent

17   Anthony DelVecchio to further the scope of SOG's initial investigation.   When members

18   of DEA and SOG (referred to throughout this Affidavit as "agents") first came across this

19   Facebook-related information, they were only able to view the public Facebook profile

20   information of these accounts (such as the accounts' listed "friends").   Even from this

21   limited information, agents could see that there were many mutual friends among these

22   accounts.   The accounts' listed friends included Jerry Austin RODGRIGUEZ Jaime,

23   Natasha DJORDJEVIC, Allex HUBLY, David HUBLY, Blake HYNEK, Megan

24   CHAPMAN, Charles JOSLYN, Shalesha HUDSON, and others, all of whom have

25

26   [1] The first six controlled buys performed by SOG totaled approximately 90.4 grams of suspected heroin. The
     seventh buy SOG conducted was done in conjunction with DEA, and agents obtained 46.2 gross grams of suspected
27   heroin during this seventh purchase, for 136.6 gross grams total between the first seven controlled purchases from
     this DTO using CS1.
28

AFFIDAVIT OF JEREMY TAN - 12

1    criminal histories involving drug crimes, which corroborated CS1's information about

2    Juan Castro's use of these Facebook accounts specifically for drug trafficking purposes.

3    Agents believed these individuals (and others) were the local heroin distributors for the

4    CASTRO DTO based on the information provided by CS1, the criminal histories of these

5    Facebook friends, and agents' training/experience.  Subsequent physical and electronic

6    surveillance furthered these suspicions.

7        35.    Det. Ejde and Agent DelVecchio confirmed Juan Castro's identity via

8    records contained in the Washington Department of Licensing (WADOL) database.

9    Specifically, Juan Castro's WADOL photograph matches that of the individual on the

10    "Juan Andres Castro Valenzuela" Facebook account.  Furthermore, according to a law

11    enforcement database, Juan Castro was involved as a suspected "cell head" for heroin

12    distribution in the Everett area during a DEA investigation that took place in 2012.

13    Special Agent DelVecchio researched this prior DEA case and found Juan Castro was, in

14    fact, the primary target of investigation in that case.  Agents seized multiple kilograms of

15    heroin in that investigation, but did not arrest Castro.

16        36.    Juan Castro used the aforementioned Facebook accounts, as well as various

17    telephone numbers, to set up drug deals with CS1.  According to CS1, Juan Castro

18    typically arranged the transaction, but sent another Hispanic male to conduct the

19    transaction with CS1.  CS1 explained that he/she has met several different Hispanic

20    males across the Puget Sound region to conduct these drug transactions.  CS1 told law

21    enforcement he/she typically purchased 1-2 ounces of heroin several times per week.

22        37.    CS1 met with a Hispanic male whom CS1 knew as "Miguel" during many

23    of his/her controlled purchases with SOG.  Agents positively identified "Miguel" as Jesus

24    Rene SARMIENTO Valenzuela by comparing surveillance photographs of CASTRO

25    DTO members, photographs on SARMIENTO's Facebook account, and SARMIENTO's

26    visa information from the United States Department of Homeland Security.

27        38.    In late October 2017, members of the DEA Tacoma Resident Office (TRO)

28    and SOG conducted a controlled purchase of heroin from the CASTRO DTO using CS1.

AFFIDAVIT OF JEREMY TAN - 13

1  This was the seventh overall controlled purchase from the DTO.  Agents conducted
2  surveillance of the DTO before and after this purchase, and searched CS1 and CS1's
3  vehicle for contraband before and after the purchase with negative results.  Agents
4  watched SARMIENTO make a suspected drug delivery and subsequent money transfer,
5  as well as conduct the controlled purchase with CS1.  Before and immediately following
6  this controlled buy, agents observed SARMIENTO drive TV1 to Soltero's Market
7  Mexican Store, 24202 104th Ave. SE, Unit 104, Kent, Washington.  Additionally, agents
8  observed SARMIENTO with a then-unidentified Hispanic male and suspected heroin
9  distributor; agents later identified that Hispanic male as Carlos Eduardo LOPEZ
10  Hernandez.  These early observations of SARMIENTO and LOPEZ were agents' first
11  look at LOPEZ as the driver of a silver Honda Civic bearing Washington license plate
12  BEX3964 (Target Vehicle 2 or TV2).

13            c.      ***DEA Begins Undercover Operations from the CASTRO DTO***

14        39.      After this seventh controlled purchase, CS1 was able to introduce a DEA
15  Undercover Agent (UC) to the CASTRO DTO via a conversation over Facebook
16  Messenger (with the Katherine Thomas Facebook account).  The UC was able to conduct
17  three purchases of heroin from the CASTRO DTO, through SARMIENTO, before the
18  end of 2017.  SARMIENTO used TV1 during each of these transactions and they all took
19  place in public parking lots.  Prior to the first undercover purchase, agents identified a
20  trailer located at 22025 100th Ave. SE, Kent, Washington, as SARMIENTO and
21  LOPEZ's residence.

22        40.      During the first purchase, the UC used a combination of communications
23  over Facebook Messenger (with the Katherine Thomas account), TT1, and TT3 to
24  complete the transaction.  Agents saw SARMIENTO leaving the 22025 100th Ave. SE,
25  Kent, Washington, residence, via a mounted surveillance camera, prior to this purchase.
26  SARMIENTO went to Soltero's Market Mexican Store, 24202 104th Ave. SE, Unit 104,
27  Kent, Washington, where agents saw, via a mounted surveillance camera, him go in
28  before leaving to conduct the purchase with the UC.  SARMIENTO delivered about 49.5

1  grams (net weight) of a substance analyzed by the DEA Western Regional Laboratory

2  (WRL) and found to be 30-34% pure heroin.  This is the typical purity level for high-

3  purity heroin in Western Washington.  Via GPS tracking, agents followed SARMIENTO

4  back to the 22025 100th Ave. SE, Kent, Washington, residence following the completion

5  of the purchase.  During the UC's second purchase, he/she communicated with the DTO

6  through the Katherine Thomas Facebook account and TT1.  SARMIENTO delivered

7  about 99.3 grams (net weight) of a substance analyzed by the DEA WRL and found to be

8  41-47% pure heroin.  This purity level was higher than the typical purity level for high-

9  purity heroin in Western Washington.  Due to this unexpected purity, agents opted to see

10 if the DTO could provide heroin of equal quality in powder form.  The UC conducted a

11 third transaction with the DTO in December 2017.  Again, the UC communicated with

12 the CASTRO DTO over the Katherine Thomas Facebook account and TT1, and

13 SARMIENTO delivered the drugs using TV1.  Again, agents observed, via mounted

14 surveillance cameras at both locations, SARMIENTO leave the 22025 100th Ave. SE,

15 Kent, Washington, residence and travel to Soltero's Market Mexican Store, 24202 104th

16 Ave. SE, Unit 104, Kent, Washington, before conducting the transaction.  SARMIENTO

17 delivered about 49.7 grams (net weight) of a substance analyzed by the DEA WRL and

18 found to be 33-37% pure heroin.  This was back to the typical purity level agents have

19 encountered for high-purity heroin in Western Washington.

20     41.     During this third undercover purchase, SARMIENTO told the UC he would

21 be returning to Mexico in the near future.  Sure enough, agents used physical and

22 electronic surveillance means later in December 2017 to watch SARMIENTO leave

23 Washington and head to Mexico.  On December 24, 2017, Juan Castro contacted the UC

24 through Facebook Messenger, using the Katherine Thomas account.  Juan Castro

25 explained to the UC that his cousin, "Luis" would be the point of contact for any

26 immediate deals the UC required.  Castro told the UC he/she could contact "Luis" via

27 phone number 206-698-1965 (Target Telephone 4 or TT4), but not over Facebook

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  Messenger.  The following transcript reflects the referenced discussion between Juan
2  Castro and the UC on December 24, 2017:

3  • CASTRO:  "good morning, if you need something please call or
4  send text to my cousin Luis: 2066981965 (not messenger)"

5  • UC:  "Good morning amigo, thank you for that.  I will be in Ohio
6  with family for the holidays for the next couple weeks.  Is there someone there that
7  can do business?"

8  • CASTRO:  "maybe"

9  • UC:  "Ok, good"

10  42.  The UC then made contact with "Luis" over TT4 in mid-January 2018, but
11  the two were not able schedule a drug transaction.  The UC contacted Juan Castro on the
12  Katherine Thomas Facebook account and confirmed "Luis" was, in fact, the new courier;
13  Juan Castro told the UC to just contact him (Castro) directly and he would handle the
14  specifics with "Luis."

15  43.  Shortly thereafter, agents received hundreds of pages of Facebook account
16  information from the Katherine Thomas account, pursuant to a federal search warrant.
17  This information received from Facebook clearly showed use of the Katherine Thomas
18  account for drug trafficking purposes, just as agents had suspected.  Agents later received
19  court authorization to search additional accounts associated with the CASTRO DTO and
20  found very similar data of evidentiary value.  The following review of the Katherine
21  Thomas Facebook account will serve as an example of the types of data/information and
22  content agents received from the search warrants later executed on additional CASTRO
23  DTO accounts.

24  d.  *A Brief Review of the Katherine Thomas Facebook Account*

25  44.  Facebook records showed account number "100021806071829," which is
26  associated with the vanity name of "Katherine.thomas.104418," was registered on August
27  24, 2017, at 19:19:37 UTC.  As of January 2018, Facebook records showed the account

28

1   was still active.  The verified cell phone number associated with this account was

2   "+526681994039" (TT1), which was verified through Facebook on the day the account

3   was established.  Facebook records showed a listing of internet protocol (IP) addresses

4   captured during different activities on Facebook (such as logging in or sending an

5   attachment).  DEA Resident Agent in Charge (RAC) Ian McKenzie conducted an IP

6   lookup and found the majority of the IP addresses associated with this Facebook account

7   were static IP addresses located in Los Mochis, Sinaloa, Mexico.  This information is

8   consistent with information received from CS1 as well as agents' own information

9   gathering efforts regarding Juan Castro's location.

10      45.    These records also showed three linked accounts used by the same digital

11  device/computer:  Katherine Thomas (100021806071829), Florencio Castro Valenzuela

12  (100006465750228), and Annel Baker (100017854953772).  Agents had separately

13  established this same connection between these accounts based on CS1's information and

14  their own records searches.  Agents know the CASTRO DTO used the Annel Baker

15  account previously in the same manner as they used the Katherine Thomas account,

16  based on CS1's information.

17      46.    Facebook records showed the listed date of birth on the Katherine Thomas

18  account as "02/24/1990."  Juan Castro's criminal record lists his date of birth as February

19  24, 1986.  Agents suspect the common birthdate of "February 24" between the Katherine

20  Thomas Facebook account and Juan Castro is no coincidence, and that Castro most likely

21  used it because it is a date he can easily remember.

22      47.    These Facebook records also list all of Juan Castro's Facebook friends

23  associated with this particular account and their Facebook account numbers.  Agents have

24  identified all of these Facebook friends based on their names and Facebook photographs,

25  and a comparison with WADOL records.  Agents have conducted surveillance on many

26  of the individuals listed below, along with law enforcement research on these individuals,

27  and suspect, based on agents' physical surveillance observations, they are heroin

28  distributors for the CASTRO DTO in Washington.  The Facebook Messenger portion of

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

the records received from Facebook also corroborated agents' suspicions regarding these individuals. As expected, the UC's Facebook account is also listed in this section of the report. Some of the listed "friends" for the Katherine Thomas account are as follows:

- Megan CHAPMAN (100016721526235)
- Charles JOSLYN (100013322561905)
- Shalesha Renee [HUDSON] (1510578017)
- Blake HYNEK (100000545221409)
- Allex HUBLY (100016996650297)
- Jay A JAIME [Jerry Austin RODRIGUEZ Jaime] (100001871793095)
- David HUBLY (100012023506652)
- Natasha DJORDJEVIC (100000861552774)

48.     Facebook records also showed which people Juan Castro had sent a "friend request" to or received a "friend request" from on the Katherine Thomas account. These records included those individuals listed above. The following list shows some of those who either received but did not respond to Juan Castro's Facebook friend request or outright rejected Juan Castro's Facebook friend request, indicating they may have distributed heroin with Juan Castro in the past, but no longer wished to do business with him, were using an alternate Facebook account, or did not recognize the new Facebook account Juan Castro was utilizing:

- Tim CRAWFORD (100007321574979)
- Tim CRAWFORD (100000859215933)
- Allex Annala [HUBLY] (100008229828661)
- Allex Annala [HUBLY] (100006281329451)
- Megan CHAPMAN (100002260914787)

49.     The last portion of the Facebook records was a chronological listing of messaging strings, separated by individual Facebook accounts. These messaging strings were similar to text message conversations commonly found on mobile phones, though

AFFIDAVIT OF JEREMY TAN - 18

1    these messaging conversations were between the Katherine Thomas account and the

2    Facebook friends listed above (the suspected heroin distributors for the DTO). Agents

3    conducted a review of the messaging section of the Katherine Thomas account records

4    and noted some key items of information that were relevant to the investigation, with

5    particular regard to some of the CASTRO DTO members discussed in this Affidavit, as

6    described in the following paragraphs.

7         50.   <u>Josh MENDIOLA</u>:  On December 2, 2017, MENDIOLA introduced

8    himself to Juan Castro as "Jay's friend."  Agents believe MENDIOLA was referring to

9    Jerry Austin RODRIGUEZ Jaime based on MENDIOLA's description of

10   RODRIGUEZ's then-residence, 10723 59th Ave. E, Puyallup, Washington.

11   MENDIOLA also provided Castro with a description of his vehicle, a white Nissan

12   Maxima, and his address (7111 193rd St. East, Spanaway, Washington). This

13   information coincides with MENDIOLA's known address based on WADOL records and

14   public records searches; as explained further in Sections VII (dd) & (ee), it appears

15   MENDIOLA was living with Jake WILSON at that address at that time but is now

16   residing elsewhere.  On December 20, 2017, Castro sent MENDIOLA a picture of

17   Castro's new "cousin" who would be arriving in the United States soon to deliver heroin

18   in the place of Jesus SARMIENTO.  Agents reviewed this picture and positively

19   identified Arturo FRIAS Ceballos as the individual in the photograph, whom Castro was

20   calling "Luis."  On December 23, 2017, MENDIOLA sent a message to Castro which

21   read, "I have been slowing down and laying low hese [sic] last couple days.  One of my

22   dealers go [sic] caught so been taking it easy…"  Two days after this messaging

23   exchange, MENDIOLA sent additional communications to Castro that complained about

24   the quality of Castro's heroin.  As agents continued to look through other messaging

25   exchanges with Castro, they noticed others were also complaining about the heroin

26   quality around that same time.  In their review of additional messages between

27   MENDIOLA and Castro, agents noticed MENDIOLA referred Castro to the location of

28   13308 Meridian East, Puyallup, Washington (a Safeway parking lot where agents had

AFFIDAVIT OF JEREMY TAN - 19

1 followed Castro's courier to previously), discussed heroin pricing with Castro, and used
2 coded language to order heroin (using phrases like "ready for dark").

3     51.     From these Facebook records, agents can account for Juan Castro supplying
4 MENDIOLA with no less than 330 grams of heroin in one month's time.

5     52.     Allex HUBLY:  On December 14, 2017, HUBLY asked Juan Castro about
6 the "blue pills" and if she could have more of those pills from Castro. Castro said he was
7 sold out but would have more on "Saturday." HUBLY asked if the pills were "for sure
8 real," and Castro replied, "llok [sic], this pills are manufactured in clandestine
9 laboratories, these are not pharmaceutical." Agents believe HUBLY and Castro were
10 likely discussing counterfeit oxycodone pills, based on HUBLY's specificity with regard
11 to the color of the pills. On November 24, 2017, HUBLY sent Castro a police report that
12 involved Blake HYNEK and another individual. Based on that messaging conversation,
13 agents believe HYNEK likely introduced HUBLY to Castro, similar to the way HYNEK
14 introduced CHAPMAN to Castro.

15     53.     From these Facebook records, agents can account for Juan Castro supplying
16 Allex HUBLY with no less than 561 grams of heroin in less than two months.

17     54.     Jerry Austin RODRIGUEZ Jaime:  During a Facebook Messenger
18 conversation on November 27 and 28, 2017, Juan Castro told RODRIGUEZ (using an
19 account in the name "Jay A Jaime") the "work" was "very slow" and he "needed more
20 people." I believe this was Castro's way of telling RODRIGUEZ that he (RODRIGUEZ)
21 needed to sell more heroin or find other distributors to sell more of Castro's heroin.
22 RODRIGUEZ told Castro, "I have alot [sic] of customers undee [sic] me." Castro
23 seemed to like RODRIGUEZ's claim of having many drug customers and then offered to
24 provide RODRIGUEZ with a half-ounce of heroin on a "front." This means Castro was
25 agreeing to provide RODRIGUEZ with the drugs without requiring RODRIGUEZ to pay
26 for them at the time of delivery.

27     55.     On December 1, 2017, RODRIGUEZ provided Juan Castro with his phone
28 number (253-363-5327). Agents' review of Facebook records found this number to

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   coincide with RODRIGUEZ's listed phone number.  On December 1, 2017,

2   RODRIGUEZ sent a picture of his house and (then-current) address, 10798 59th Ave.

3   East, Puyallup, Washington, to CASTRO.  Agents have watched TV1 travel to this

4   residence many times, using physical and electronic surveillance means.  On December

5   4, 2017, CASTRO provided an address to RODRIGUEZ of "23953 104th SE, Kent WA

6   98031."  Agents believe this residence was a possible drug stash house for the CASTRO

7   DTO, based on these messages.  Similar to Castro's activities with MENDIOLA, on

8   December 20 2017, Castro sent a picture of FRIAS to RODRIGUEZ and told

9   RODRIGUEZ, "Luis" had just arrived at the airport.  From these conversations between

10  Castro and RODRIGUEZ, RODRIGUEZ seems to prefer his heroin in the form of

11  "stones" and not "powder" because the heroin is easier for RODRIGUEZ to sell in that

12  form.

13      56.     From these Facebook records, agents can account for Juan Castro supplying

14  RODRIGUEZ with no less than 247 grams of heroin in just over one month.

15      57.     Tim CRAWFORD:  On December 22, 2017, Juan Castro messaged

16  CRAWFORD but never received a response.  Castro referred to CRAWFORD as

17  "amigo," which is the same word Castro used to refer to the UC in this investigation; he

18  also referred to almost all of his drug customers as "amigos" or "amigas."

19      58.     Blake HYNEK:  On November 28, 2017, Juan Castro sent a photograph of

20  court documents to HYNEK.  These documents involved HYNEK and another person; it

21  seemed as though the court paperwork was documenting HYNEK's cooperation with

22  police regarding an apparent crime the other person had committed.  As described above,

23  agents know Allex HUBLY provided Castro with these materials on November 24, 2017.

24      59.     On December 7, 2017, Juan Castro told HYNEK, "we have m-30 pills

25  (fentanyl)."  HYNEK then asked Castro for "pure fentanyl powder," but Castro told

26  HYNEK "that is too dangerous."  During a prior messaging conversation on December 4,

27  2017, HYNEK offered to provide Castro with fentanyl.

28

60.     From the review of Facebook messages between HYNEK and Juan Castro, and electronic surveillance of TV1, agents believe Castro's couriers often delivered directly to HYNEK's residence. On December 23, 2017, HYNEK complained to Castro about the quality of some of the heroin he had received from Castro. HYNEK sent Castro three photographs of suspected rock heroin, and he did not seem to like this form of the drug for distribution. Castro told HYNEK the heroin might look different but the quality was still excellent. HYNEK told Castro that his customers preferred the form of heroin that was easier to smoke. Castro sent HYNEK a photograph of suspected heroin powder as a way to confirm with HYNEK that his courier was about to deliver the right product to HYNEK. HYNEK confirmed the product was what he wanted. Castro subsequently directed HYNEK to a residence in Kent ("22919 112th Pl SE, Kent, WA 98031") in order to conduct a drug transaction and possible exchange. Castro called this residence "my house" and said it was "better" for doing the deal. Agents had watched TV1 travel to this location during surveillance operations. On January 1, 2018, HYNEK told Castro he had more "clientele" for Castro. He then said, "The clients [sic] name is Megan chapman [sic]." Castro subsequently informed HYNEK that he "added" CHAPMAN on Facebook.

61.     From these Facebook records, agents can account for Juan Castro supplying HYNEK with no less than 450 grams of heroin in one month's time.

62.     Megan CHAPMAN: On January 1, 2018, CHAPMAN introduced herself to Juan Castro as "blakes homegirl"; agents believe CHAPMAN was referring to Blake HYNEK, based on their knowledge of HYNEK's drug relationship with Castro, the large drug debt he owed to Castro, and HYNEK's association to CHAPMAN. On the following day, CHAPMAN provided her phone number to CASTRO as "253-433-9044" and her address as "19914 80th St. Ct E, Bonney Lake, WA 98391." CHAPMAN's conversation string with Castro confirmed agents' physical observations of TV1 on January 3, 2018. This messaging string referred to CHAPMAN physically meeting Castro's drug courier for a drug transaction in which CHAPMAN provided Castro's

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   courier with $630.  This was one of the only captured exchanges between Castro and

2   CHAPMAN via Facebook Messenger due to the timing of agents' search warrant

3   execution; CHAPMAN introduced herself to the organization in January 2018, shortly

4   before Facebook provided this data to agents.

5          63.    <u>Shalesha Renee [HUDSON]</u>:  Agents positively identified Shalesha Renee

6   as Shalesha Renee HUDSON from her Facebook and WADOL photographs.  From these

7   messages, it looks like HUDSON and Juan Castro's drug relationship began around mid-

8   November 2017.  HUDSON typically ordered multiple pieces of heroin from Castro and

9   did so on a regular basis.  On November 27, 2017, Castro sent HUDSON a photograph of

10  the court document involving HYNEK and another person, and told her to "beware of

11  Blake."  Castro also asked HUDSON if she was familiar with a man with the initials L.Y.

12  HUDSON said she was not familiar with that person.

13         64.    HUDSON provided 35703 16th Avenue South, Federal Way, Washington,

14  as a safe address at which she and Juan Castro's courier could conduct their heroin

15  transactions; HUDSON indicated this address belonged to one of HUDSON's friends.

16         65.    From December 19 to December 22, 2017, Juan Castro confronted

17  HUDSON about her buying heroin from other people, which HUDSON acknowledged.

18  She then ordered one and a half pieces of heroin (approximately 38 grams) from Castro

19  and had his courier deliver the drugs to her hotel room in Tacoma.  Castro sent her a

20  picture of his "new cousin," FRIAS.  After the deal, HUDSON complained to Castro

21  about the quality of the product and Castro assured her it was "the same."  HUDSON

22  then inquired as to "how much" Castro would charge "for 10 pieces" (approximately 250

23  grams).  Castro replied, "9k," which I believe meant $9,000.00.

24         66.    On December 22, 2017, HUDSON told Juan Castro to send his courier to

25  HUDSON's "house on 43rd."  From the messages that followed, agents determined

26  HUDSON was referring to a residence near 43rd Street and Portland Avenue East, in

27  Tacoma, Washington.  Agents had seen TV1 travel to this area on several occasions, and

28  remain in place for short durations of time, consistent with drug trafficking activity.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

67.     From these Facebook records, agents can account for Juan Castro supplying HUDSON with no less than 675 grams of heroin over the course of a month and a half.

68.     <u>Charles JOSLYN</u>:  On December 27, 2017, Juan Castro and JOSLYN initiated their Facebook Messenger conversation.  JOSLYN told Castro he lived in Bonney Lake, Washington and said he was "Jessie's cousin."  Agents believe JOSLYN was referring to an individual with the initials J.J.K., based on J.J.K.'s Facebook friendship with Castro.  JOSLYN attempted to call Castro, but Castro did not answer. Castro then told JOSLYN he does not understand English but is able to use Google translate.  JOSLYN asked Castro if he could supply crystal methamphetamine in addition to heroin.  Castro told him he could only supply "dark," meaning heroin.  JOSLYN asked about Castro's working hours and Castro told JOSLYN that he distributes drugs between the hours of 8:00 a.m. and 9:30 p.m.  JOSLYN and Castro also arranged a drug deal on this date (one that occurred at the Target store located at 26301 104th Ave. SE, Kent), during which JOSLYN explained it would be better to do the deal in TV1 because JOSLYN had brought his children with him and they were in his car already, occupying space.  JOSLYN described his vehicle as a "dark blue 92 Acura legend."

69.     On December 30, 2017, JOSLYN provided his address to Juan Castro as "209 21st Ave. SW, Puyallup, Washington"; the conversation suggested the drug transaction occurred at JOSLYN's residence.  JOSLYN seemed to typically receive 12 to 50 grams of heroin at a time from Castro, though on December 30, 2017, JOSLYN inquired about Castro's pricing on "quarter pounds" or "100 grams."  Castro told JOSLYN it would be $4,300 and JOSLYN thought that price was too much.  JOSLYN tried to negotiate with Castro and bargain him down to $3,600 for 100 grams of heroin. From the messaging data agents received, it did not look like Castro ever responded to that request.  TV1 was once again referenced in this conversation string.

70.     From these Facebook records, agents can account for Juan Castro supplying JOSLYN with no less than 65 grams of heroin in the span of one week.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

71.   Since execution of the search warrant on the Katherine Thomas account in January 2018, agents have obtained search warrants for eleven Facebook accounts used by the Castro brothers: Katherine Thomas, Juan Andres Castro Valenzuela, Florencio Castro Valenzuela, Annel Baker,[2] Rebeca Spencer, Alissa Keyser, Gina Morris, Chris Holdford,[3] Rudy Jackson, Steve Larson, and Tom Ryan.  All of the accounts were linked to each other and/or the Castros by information either from CS1, data indicating they were accessed by the same electronic device, common "friends" lists, or some combination of the above.  All of the search warrants were issued by federal Magistrate Judges in this District.

e.   ***Agents Identify Juan Castro's New Courier and Conduct another Undercover Purchase***

72.   Juan Castro sent a picture of SARMIENTO's replacement (whom he called "Luis") to many of his Washington-based distributors, via Facebook Messenger.  These Facebook records also showed Castro searched for "Luis Ortiz Zavala," "Arturo Zavala," and "Arturo Ortiz Zavala," all on the same day, in early December 2017.  Agents suspected these searches reflected Castro's attempts to locate "Luis" on Facebook.  Agents searched law enforcement databases using these names as a way to compare any photos they found to the photos of "Luis" which Castro had provided to his Washington distributors.  Agents were able to identify "Luis" as Arturo FRIAS Ceballos from this process.

73.   Agents soon found FRIAS was living with LOPEZ at the DTO's stash house, 22025 100th Ave. SE, Kent, Washington, and was driving TV1 just as

---

[2] Agents did not receive any results from the search warrant of this account.  Facebook representatives said they could not process the request because the "Annel Baker" account no longer existed and no historical data was available.

[3] Agents did not receive any messages in the returned materials from Facebook for the Chris Holdford account.  Facebook support personnel stated that one explanation for the absence of data would be that the user deleted all of his/her conversations over Facebook Messenger.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  SARMIENTO previously had.  Agents conducted another undercover purchase of

2  powder heroin from the DTO at the end of January 2018.  FRIAS showed up to the

3  purchase in TV1 and delivered 87.5 gross grams (with packaging) of suspected heroin to

4  the UC.  This substance field-tested positive for the presence of heroin.

5      74.    About a week later, Juan Castro contacted the UC from a new Mexico-

6  based phone number (52-668-168-7860), but then did not respond to the UC's subsequent

7  messages.  Agents continued to conduct physical and electronic surveillance of FRIAS

8  and LOPEZ during this time.  Agents watched FRIAS make suspected deliveries to many

9  of the already-identified Washington-based distributors for the DTO, and watched

10  LOPEZ make routine trips to locations in Seattle and Everett, Washington.  Agents

11  conducted research on these locations and found that one of them, 314 N 133rd St.,

12  Seattle, Washington, belonged to Rolando ESPINDOLA Hernandez and Jessica

13  JOHNSON, and the other previously belonged to Jaime HEREDIA Castro.

14      75.    Working with their law enforcement counterparts in Snohomish County,

15  Washington, agents learned ESPINDOLA and JOHNSON had been identified as money

16  launderers in several prior and unrelated investigations involving Mexican DTOs

17  operating in Western Washington.  Agents also learned HEREDIA was identified during

18  a previous police investigation as a heroin supplier to several Mexican DTOs operating in

19  Snohomish and King Counties (in Washington).

20      76.    Agents attempted to have the UC purchase fentanyl pills from Juan Castro

21  in February 2018, but that deal ultimately fell through.  Castro also told the UC he would

22  be traveling up to Washington, through Arizona, in the middle of February 2018.  The

23  UC planned to meet Castro in person during his visit to Washington.  Things were

24  progressing nicely for the UC, considering his/her relatively new status within the DTO.

25  Unfortunately, Castro stopped talking to the UC in mid-February 2018, right after they

26  made their loose arrangements to meet.

27      77.    Agents continued their physical and electronic surveillance of the DTO

28  members in Washington throughout February, March, and April 2018.  They watched

AFFIDAVIT OF JEREMY TAN - 26

1   LOPEZ continue to make routine trips up to ESPINDOLA/JOHNSON's residence, 314

2   N 133rd St., Seattle, Washington, and HEREDIA's previous residence in Everett.  These

3   trips were always of short duration and often LOPEZ would drive directly back to his

4   residence after these trips.  As time went on, FRIAS moved to an apartment complex in

5   Kent, Washington, and LOPEZ moved to an apartment in Auburn, Washington.  The two

6   continued to use the identified DTO stash house, 22025 100th Ave. SE, Kent,

7   Washington.

8           78.     In March and April 2018, agents executed another search warrant on the

9   Katherine Thomas Facebook account as well as search warrants on five additional

10   accounts used by the CASTRO DTO, including accounts in the names of "Gina Morris,"

11   "Alissa Keyser," "Florencio Castro Valenzuela," and "Juan Andres Castro Valenzuela."

12   The data retrieved from these Facebook accounts proved to be just as useful as agents'

13   initial search of the Katherine Thomas account.  These records showed the CASTRO

14   DTO was using the Florencio and Juan Castro Facebook accounts in conjunction with

15   several other Katherine Thomas-equivalent accounts (i.e., the Gina Morris and Alissa

16   Keyser accounts) to communicate with local distributors.  Agents also executed a search

17   warrant on TV2 after it broke down and found documentation linking LOPEZ to

18   HEREDIA inside the abandoned vehicle.

19           79.     Agents continued their investigative efforts in this manner for about two

20   months.  The combination of physical and electronic surveillance used in conjunction

21   with telephone tolls analysis and Facebook research provided agents with a basic

22   understanding of the CASTRO DTO's operations.

23           80.     In April 2018, Juan Castro gave CS1 a phone number for his cousin

24   "Carlos," and had CS1 assist "Carlos" and FRIAS with registering a vehicle (a white

25   2008 Honda Accord now bearing Washington license BJN4395, i.e., TV3) in

26   Washington.  In exchange for helping "Carlos" and FRIAS with the vehicle registration,

27   CS1 received about 50 grams of heroin from them.  Through AZ licensing records for the

28   vehicle (prior to its registration in Washington) and a photograph associated with a 2013

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   CBP arrest, agents identified "Carlos" as Juan Jose HIGUERA Gonzalez. By the end of

2   April 2018, the DTO had again cycled out its local members and Daniel ROCHA

3   replaced Carlos LOPEZ, and Juan HIGUERA replaced FRIAS. In May 2018, agents

4   identified HIGUERA's phone number (TT19) through tolls analysis, and in June 2018

5   conducted another UC purchase of heroin from the DTO. HIGUERA, using TT19 and in

6   **TV3**, delivered the drugs to the UC. Thus began the wiretap phase of the investigation

7   **VI.   AUTHORIZED INTERCEPTIONS OF CASTRO DTO MEMBERS**

8          81.   On June 27, 2018, the Honorable Ronald B. Leighton, United States

9   District Judge for the Western District of Washington, signed an Order authorizing the

10  initial interception of wire and electronic communications over TT19, used by Juan

11  HIGUERA Gonzalez. The interception of TT19 began on June 27, 2018, and ended on

12  July 9, 2018. These interceptions helped gather evidence against several local

13  distributors for the DTO and helped agents obtain court authorization to intercept one of

14  ROCHA's phones.

15         82.   On July 10, 2018, the Honorable Ronald B. Leighton, United States District

16  Judge for the Western District of Washington, signed an Order authorizing the initial

17  interception of wire and electronic communications over TT24, a phone used by ROCHA

18  (at that time, referred to as Jorge Robles Perez). The interception of TT24 began on July

19  11, 2018, and ended on July 16, 2018, when ROCHA stopped using TT24 following an

20  unsuccessful surveillance event on July 14, 2018. Despite the short duration of the

21  interception period, the intercepted communications over TT24 showed ROCHA was

22  clearly using TT24 to facilitate drug trafficking activities for the CASTRO DTO.

23         83.   Agents were able to intercept suspected drug-related communications

24  between ROCHA (TT24) and other CASTRO DTO members including HEREDIA

25  (TT25), a man then known only as "Manuel," but later identified as Manuel LOYA Soto

26  (TT27), and a man then known only as "Leo" but later identified as Leonel Sillas

27  Berrelleza (TT28). These intercepted communications clearly identified Sillas as

28  ROCHA's Mexico-based manager and a coordinator for the DTO. The intercepted

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   communications over TT24 helped agents observe a delivery of at least nine kilograms of

2   heroin, 12,000 pills, and an undetermined amount of crystal methamphetamine to

3   ROCHA on July 13, 2018.  Agents used the intercepted communications over TT24 in

4   conjunction with physical and electronic surveillance to watch ROCHA, HEREDIA, and

5   LOYA during suspected heroin and pill deliveries.  Agents also used intercepted

6   communications over TT24 to anticipate and then observe the activities of these same

7   individuals with great success.  Unfortunately, during one such attempt at the coordinated

8   use of intercepted communications over TT24 with surveillance, ROCHA detected an

9   agent's presence.  ROCHA then stopped using TT24 entirely at Sillas' direction, changed

10  the location of his drug stash (at least temporarily), and most likely notified HIGUERA,

11  HEREDIA, and LOYA of this incident since HIGUERA and LOYA got new vehicles

12  and phone numbers shortly thereafter.

13      84.     On August 20, 2018, the Honorable Ronald B. Leighton, United States

14  District Judge for the Western District of Washington, signed an Order authorizing the

15  initial interception of wire and electronic communications over TT25, TT31, and TT32,

16  used by Jaime HEREDIA, Daniel ROCHA, and Manuel LOYA, respectively.  The

17  interception of wire and electronic communications over TT25 began on August 20,

18  2018, and ended on August 23, 2018.  Agents did not activate the interceptions of TT31

19  and TT32 because data from pen registers/trap and trace devices and location monitoring

20  indicated ROCHA and LOYA, respectively, were not using those phones by the time

21  agents received court authorization to intercept them.  Agents gained little additional

22  information from such a short period of interception over TT25 (HEREDIA).  However,

23  agents were able to identify further HEREDIA's position within the DTO, and confirmed

24  some of the unidentified individuals using pre-paid phone numbers in contact with

25  HEREDIA were for drug trafficking purposes.

26      85.     After HEREDIA stopped using TT25, agents located a new phone number

27  used by HEREDIA and began intercepting wire and electronic communications over

28  another of ROCHA's phones, TT43.  On August 28, 2018, the Honorable Ronald B.

1  Leighton, United States District Judge for the Western District of Washington, signed an
2  Order authorizing the initial interception of wire and electronic communications over
3  TT43 (ROCHA).  The interception of TT43 began on August 29, 2018, and ended on
4  September 4, 2018, though agents believe ROCHA likely stopped using the device on the
5  morning of September 1, 2018.  These interceptions, even for this brief period, greatly
6  helped agents in their investigation in that they helped identify several previously
7  unidentified or unknown members of the DTO, and helped identify their roles in the
8  DTO.  These interceptions helped agents anticipate Carlos LOPEZ's return to Western
9  Washington—and then observe his pick-up at the Seattle-Tacoma International Airport.
10  Intercepted communications over TT43 also helped agents identify Oscar Humberto
11  CARRILLO Salcedo (using TT50 at that time) as a bulk cash smuggler for the CASTRO
12  DTO and served to identify previously unknown high-volume drug distributors for the
13  DTO such as Hector Manuel URIAS Moreno (then known only as "Teto") and Michael
14  John SCOTT and his wife, Esther La Rena SCOTT.

15       86.       The intercepted communications between the distribution hub for Western
16  Washington (ROCHA, TT43) and the distribution manager in Mexico (Sillas) provided
17  agents with a detailed understanding of what types and how much of each drug ROCHA
18  maintained during the time agents were intercepting communications over TT43.  The
19  intercepted conversations also provided agents with detailed knowledge of how much
20  money the DTO earned from the sale of their drugs.  On one day, ROCHA and Sillas
21  even carried out a meticulous accounting of all the drugs and money ROCHA was
22  supposed to have delivered, maintained, or transferred to others over the past month or
23  so.  This meticulous accounting allowed agents to seize those same accounted-for drugs
24  and money from ROCHA' residence when he and LOPEZ were not present.[4]  Agents
25
26
27  ---
28  [4] Agents obtained a delayed-notice search and seizure warrant for ROCHA's residence from the Honorable David
W. Christel, United States Magistrate Judge for the Western District of Washington, on August 31, 2018, and
executed the warrant that same evening.

AFFIDAVIT OF JEREMY TAN - 30

1 │ recovered over a kilogram of suspected heroin, some suspected crystal

2 │ methamphetamine, over 3,200 genuine or counterfeit oxycodone pills, and over $160,000

3 │ in cash from this seizure.  Agents believe this seizure, on August 31, 2018, is what

4 │ ultimately caused ROCHA to stop using TT43 during the morning of September 1, 2018.

5 │       87.    LOPEZ then took over ROCHA's job duties for the DTO in Western

6 │ Washington, and ROCHA returned to Mexico shortly thereafter.  On September 11,

7 │ 2018, the Honorable Ronald B. Leighton, United States District Judge for the Western

8 │ District of Washington, signed an Order authorizing the initial interception of wire and

9 │ electronic communications over HEREDIA's then-current phone (TT46), just after

10 │ LOPEZ had reclaimed his role as distribution hub for the DTO in Western Washington.

11 │ Interceptions over TT46 began on September 13, 2018, and ended on October 11, 2018.

12 │ These intercepted communications almost mirrored the intercepted communications over

13 │ TT25 (HEREDIA).  HEREDIA used TT46 to facilitate his drug trafficking activities, like

14 │ taking heroin and pill orders from his customers and speaking with the Western

15 │ Washington distribution hub (Carlos LOPEZ, TT51) about his supply needs.  HEREDIA

16 │ also used TT46 to speak with other suspected higher-level members of the DTO in

17 │ Mexico and money launderers who were previously unknown to agents.

18 │       88.    On September 24, 2018, the Honorable Ronald B. Leighton, United States

19 │ District Judge for the Western District of Washington, signed an Order authorizing the

20 │ initial interception of wire and electronic communications over URIAS' phone (TT48),

21 │ CARRILLO's phone (TT50) and LOPEZ's phone (TT51).  Interceptions over TT48 and

22 │ TT51 began the same day, and ended on October 17, 2018.  Interceptions over TT50

23 │ began on September 26, 2018, and ended on September 28, 2018 (although agents

24 │ believe CARRILLO stopped using his telephone on September 26, 2018).  The

25 │ intercepted communications over TT48 and TT51 helped agents identify over 20

26 │ additional members of the DTO, including high-volume heroin, crystal

27 │ methamphetamine, and pill distributors in Western Washington; solidify the connection

28 │ between Sillas and other high-ranking members of the DTO in Mexico; identify and

1  gather evidence against bulk drug smugglers from Arizona and California; and, most
2  notably, identify CARRILLO's new phone (TT62).

3      89.    On October 18, 2018, the Honorable Ronald B. Leighton, United States
4  District Judge for the Western District of Washington, signed an Order authorizing the
5  initial interception of wire and electronic communications over CARRILLO's current
6  phone (TT62). Interceptions began on October 18, 2018, and ended on November 17,
7  2018. Interceptions over TT62 helped agents identify, or begin to identify, additional
8  members of the DTO in Western Washington and elsewhere.

9      90.    On November 2, 2018, the Honorable Ronald B. Leighton, United States
10 District Judge for the Western District of Washington, signed an Order authorizing the
11 initial interception of·wire and electronic communications over Juan Carlos AVILES
12 Berrelleza's telephone (TT66). Interceptions over TT66 began on November 6, 2018,
13 and ended on November 8, 2018, when AVILES stopped using the phone.

14     91.    On November 14, 2018, the Honorable Ronald B. Leighton, United States
15 District Judge for the Western District of Washington, signed an Order authorizing the
16 initial interception of wire and electronic communications over Carlos Alejandro
17 CASTRO Perez's phone (TT69) and Carlos LOPEZ's current phone (TT70), as well as
18 the initial interception of wire communications over Gregory WERBER's phone (TT37).
19 Interceptions began on that same day and, with respect to TT37 and TT69, are ongoing.
20 Carlos LOPEZ stopped using his phone (TT70) on or about November 16, 2018, after
21 Sillas advised him of the police search warrant that was executed on Cesar LOYA's
22 residence on November 15, 2018.

23     92.    On November 19, 2018, the Honorable Ronald B. Leighton, United States
24 District Judge for the Western District of Washington, signed an Order authorizing the
25 initial interception of wire and electronic communications over Martin GONZALEZ's
26 phone (TT63), and the initial interception of wire communications over Ramon
27 PUENTES' phone (TT64). Interceptions over TT63 began on November 20, 2018, and
28 ended on November 28, 2018, when law enforcement arrested GONZALEZ as he was on

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   his way to deliver multiple kilograms of heroin to the CASTRO DTO.  Interceptions over

2   TT64 began on November 26, 2018, and are ongoing.

3       **VII.    PROBABLE CAUSE FOR THE LOCATION TO BE SEARCHED**

4       93.    The following paragraphs are offered in support of my belief that probable

5   cause exists to believe that the **Holiday Inn Express and Suites, 2515 196th St.**

6   **Southwest, Room 210, Lynnwood, Washington**, contains evidence, fruits and/or

7   instrumentalities of drug trafficking and money laundering crimes committed by the

8   CASTRO DTO in violation of Title 21, United States Code, Sections 841(a)(1), 843(b),

9   846, and 952, and Title 18, United States Code, Sections 1956 and 1957.

10      94.    As stated above, the intercepted calls, surveillance observations, real-time

11  tracking data, confidential source information, and enforcement activities described

12  herein do not encompass all of the information agents have collected concerning the

13  instant investigation.  Rather, I have set forth only the facts that I believe are essential to

14  establish the necessary foundation for the issuance of the requested search warrant.  As

15  such, I have included in this Affidavit several examples of drug-trafficking activity as

16  they relate to Andrew and Brittany KRISTOVICH, whom I believe reside in the **Holiday**

17  **Inn Express and Suites, 2515 196th St. Southwest, Room 210, Lynnwood,**

18  **Washington**.  The examples below are only a representative sample of the evidence

19  gathered during the entire investigation.

20      95.    On August 30, 2018, agents intercepted an outgoing call (Session 74 over

21  TT43) to Mexico-based DTO manager Sillas from Daniel Osvaldo ROCHA Lopez

22  (TT43).  During that call, Sillas told ROCHA "Teto" wanted 6,000 pills.  Immediately

23  following Session 74, Sillas also provided ROCHA with "Teto's" cellular phone number,

24  360-429-9060 (TT48).  Agents later identified "Teto" as Hector Manuel URIAS Moreno

25  by comparing photographs taken of "Teto" during surveillance to URIAS' WADOL

26  photograph.  Based on intercepted communications over TT43, agents know ROCHA

27  successfully delivered 6,000 pills to URIAS, and URIAS paid ROCHA $34,850 in drug

28  money later that same day.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

96.     On September 12, 2018, Special Agent DelVecchio received authorization from the Honorable David W. Christel, United States Magistrate Judge for the Western District of Washington, to activate real-time tracking of TT48.  On September 24, 2018, Task Force Officer (TFO) Anthony Nisco and I followed tracking data for TT48 and simultaneously observed a black 2007 Kia Rondo bearing Washington license BLE9305 (TV7) at several locations near TT48.  Subsequently, TFO Nisco and I identified URIAS as the user of TT48.  TV7 came back registered to URIAS at 428 105th St. SW, Everett Washington.  Physical surveillance further identified 428 105th St. SW, Everett Washington, as URIAS' residence.

97.     On September 24, 2018, United States District Court Judge Ronald B. Leighton (Western District of Washington) signed an Order authorizing the initial interception of wire and electronic communications for TT48.  Agents subsequently observed URIAS utilizing TV7 and TT48 to coordinate and execute drug transactions for the CASTRO DTO during the authorized period of interception.

98.     For example, on September 28, 2018, at 8:06 p.m., agents intercepted an outgoing call (Session 531 over TT48) from URIAS to Carlos Eduardo LOPEZ Hernandez (TT51), which was right after LOPEZ had received a bulk drug resupply from a suspected bulk drug smuggler, Hector JACOBO Chairez.  During Session 531, URIAS told LOPEZ, "I was told to give you a call to go over there, so you can give me something."  URIAS went on to say he was instructed to, "make the arrangements and get some paste."  LOPEZ sounded slightly confused upon hearing this, but once URIAS clarified by saying, "of the same ones that I get," LOPEZ seemed to understand.  Agents believe URIAS was referring to counterfeit oxycodone pills during this conversation, based on Sillas' past comments to ROCHA (i.e., Session 74 over TT43, referenced above) and physical and electronic surveillance.  URIAS and LOPEZ agreed to meet at a Wal-Mart in Renton, Washington.

99.     Agents observed URIAS (TV7) arrive at the previously agreed-upon Renton Walmart.  Agents then observed LOPEZ, through physical and electronic

surveillance, drive TV4 to the same Walmart. After LOPEZ arrived, I observed him exit
TV4 and walk over to TV7 (URIAS' vehicle), at which point he got into URIAS'
passenger seat carrying a bag. Shortly after, I observed LOPEZ exit TV7 and return to
TV4. Both TV4 and TV7 then left the Walmart. Agents maintained surveillance on TV7
utilizing physical and electronic means, as it returned to 428 105th St. SW, Everett
Washington. After receiving this suspected drug resupply from LOPEZ, URIAS went on
to conduct suspected drug-related deliveries to some of his associates, including Andrew
KRISTOVICH, that very same night, based on intercepted communications over his
phone (TT48) in conjunction with physical and electronic surveillance.

100. Intercepted communications over TT48 have shown URIAS is primarily a
high-volume drug distributor, with connections to DTO managers in Mexico. URIAS
and LOPEZ likely share the same source of supply and, thus far, it appears as though
URIAS receives most of his drugs from LOPEZ. URIAS has several high-volume pill
redistributors including Andrew Cain KRISTOVICH and his wife, Brittany Renae
KRISTOVICH. Based on intercepted communications over TT48, agents believe URIAS
has supplied the KRISTOVICHs with crystal methamphetamine and heroin in addition to
a large number of counterfeit oxycodone pills (likely made with fentanyl). Andrew
KRISTOVICH even asked URIAS if he could supply 1,000 to 2,000 pills per day to just
KRISTOVICH.

101. Agents first intercepted KRISTOVICH (aka "Mentas," the Spanish word
for "mints") over TT48 on September 25, 2018. Before that time, agents did not know of
KRISTOVICH's involvement with the DTO. His initial messages to URIAS were
complaints about a recent batch of pills (or "mints") he had received from URIAS—
1,000 pills to be precise. These "mints" were apparently burning the throats of
KRISTOVICH's customers. KRISTOVICH said the pills were a different color than the
"good" ones URIAS had previously delivered, and these bad pills had a smaller stamped
emblem.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

102.    It took several days and many text messages between URIAS and KRISTOVICH to get this problem solved.  During this time, KRISTOVICH told URIAS he (KRISTOVICH) would need URIAS to supply him between 1,000 and 2,000 pills per day (Session 316 on TT48).  KRISTOVICH said he would need "60,000 a month" based on his current trend in sales.  Eventually, URIAS received a resupply of pills from LOPEZ and delivered 800 pills to KRISTOVICH at an Extended Stay hotel in Bothell, Washington.  Agents also intercepted KRISTOVICH asking URIAS (TT48) for "4 ounces of ice" (crystal methamphetamine) on multiple occasions, heroin ("coffee"), and more pills (regularly).

103.    Agents conducted physical and electronic surveillance of URIAS during at least two of his visits to KRISTOVICH at that Extended Stay hotel before agents had identified KRISTOVICH.  Agents later served a subpoena on the hotel and found KRISTOVICH's room (Room 419 per Session 189 and other sessions over TT48) was rented under the name of Brittany KRISTOVICH.  Agents confirmed Brittany was staying in the room by physically knocking on the door and observing her answer.  Public database research showed Brittany is married to Andrew KRISTOVICH.  Based on Session 722 on TT48, agents know Brittany is also involved in KRISTOVICH's drug dealing.  Brittany also implicated her husband as the user of 206-702-7398.  Session 722 was a text message reading as follows: "Do we owe anything?  Going to ask for piece of coffee but pay you later if not ... this is his wife."  Agents believe Brittany KRISTOVICH was using Andrew's phone in this instance, to ask URIAS for 25 grams of heroin (or "a piece of coffee").

104.    During the last four days of authorized interceptions over URIAS' phone (TT48), KRISTOVICH requested 1,000 pills from URIAS at least one time on each of those days.  These requests were consistent with KRISTOVICH's earlier claims to URIAS that he would be able to sell at least 1,000 pills per day—and up to 2,000 if URIAS could steadily supply them.  Based on tracking data for TT48 and intercepted communications over TT48, agents believe URIAS supplied KRISTOVICH with 2,000

1 pills during this four-day period.  For instance, during Session 1236 on TT48 (intercepted
2 on October 8, 2018), URIAS asked KRISTOVICH, "How are you?"  KRISTOVICH
3 replied, 'Hey man!  I'm alright dude.  I need a thousand."  URIAS then said, "A
4 thousand?  Okay.  I'll see you."  Tracking data for TT48 during that call showed URIAS
5 was at his residence in Everett, Washington.  After that call, TT48's tracking data showed
6 URIAS left his residence and drove to the Extended Stay Hotel located at 923 228th
7 Street Southeast, Bothell, Washington.  TT48's tracking data showed the device was at
8 the hotel at 3:15 p.m., and, based on my training and experience, I believe URIAS
9 traveled there to supply KRISTOVICH with 1,000 counterfeit oxycodone pills.

10        105.    On October 21, 2018, at 6:24 p.m., tracking data associated with TV7
11 (URIAS' vehicle) indicated URIAS was at the Public Storage facility located at 1715
12 228th Street, Bothell, Washington.  Tracking data showed TV7 remained at the entryway
13 of the facility for around ten minutes and then traveled through the entry gate, where it
14 then stopped in the center area of the facility for about another ten minutes.  This Public
15 Storage facility is very close to the Extended Stay hotel where agents believe
16 KRISTOVICH and his wife were residing at that time.  Agents believed URIAS traveled
17 to this location to conduct a drug transaction with KRISTOVICH.

18        106.    On October 30, 2018, agents reviewed the video surveillance footage from
19 this Public Storage business on October 21, 2018, and confirmed TV7 waited at the
20 entryway to the facility for about ten minutes before it drove past the gated entryway.
21 This footage also showed Andrew KRISTOVICH's vehicle, a 2002 silver Mercedes
22 3204D bearing Washington license AYT2335 (TV12), arrived at the location about ten
23 minutes after TV7 had initially arrived.  TV12 and TV7 drove into the facility and parked
24 in close proximity to Unit 0063.  This also explained why TV7 remained at the entryway
25 to the facility for ten minutes—URIAS was waiting for KRISTOVICH to arrive.

26        107.    Agents obtained a delayed-notice search warrant for Unit 0063 at this
27 storage facility on October 31, 2018, from the Honorable J. Richard Creatura, United
28 States Magistrate Judge for the Western District of Washington.  Agents conducted their

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   search of KRISTOVICH's storage unit while no one else was present at the facility.

2   Although agents found items indicative of drug and gun storage inside the storage unit

3   (i.e., a safe labeled "drug box," several gun cases with molded cutouts for six different

4   firearms, and a rolling tool chest labeled and partially filled with firearms parts and

5   accessories), they did not recover any drugs or guns. Agents believe KRISTOVICH

6   moved the location of these items before agents conducted their search. I believe

7   KRISTOVICH is either storing these items in TV12 or at his current location, the

8   **Holiday Inn Express and Suites, 2515 196th St. Southwest, Room 210, Lynnwood,**

9   **Washington.** Based on intercepted communications over TT48 (URIAS' phone) and the

10  aforementioned search warrant at KRISTOVICH's storage unit, I believe Andrew and

11  Brittany KRISTOVICH are local drug redistributors, with access to firearms. The

12  KRISTOVICHs are capable of selling thousands of counterfeit oxycodone pills per day,

13  as well as heroin and crystal methamphetamine. Agents have previously seen URIAS

14  deliver drugs directly to KRISTOVICH in his hotel room at the Extended Stay hotel in

15  Bothell (on multiple occasions), as supported by intercepted communications over TT48.

16          108.    Throughout this investigation, agents have observed KRISTOVICH change

17  his place of residence many times. For example, on November 25, 2018, agents observed

18  the KRISTOVICHs' vehicles (TV11 and TV12) parked at the Extended Stay America at

19  3021 196th Street SW, Lynnwood, Washington, indicating to agents the KRISTOVICHs

20  were likely using this place as their primary dwelling. On November 28, 2018, Special

21  Agent Anthony DelVecchio served an administrative subpoena at the Extended Stay

22  America and confirmed agents' suspicions by discovering Andrew KRISTOVICH as

23  being the person renting Room 410 until December 9, 2018.

24          109.    However, on November 30, 2018, when agents established surveillance on

25  the Extended Stay America, 3021 196th Street SW, Lynnwood, Washington, to install

26  court-authorized tracking devices on KRISTOVICH's two vehicles (TV11 and TV12),

27  neither vehicle was present. Agents remained in place for hours, but the vehicles never

28  returned. Agents set out to find TV11 and TV12 during the early morning hours of

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    December 1, 2018, and located both vehicles at the **Holiday Inn Express and Suites,**

2    **2515 196th St. Southwest, Lynnwood, Washington**. Agents installed tracking devices

3    on TV11 and TV12 at that time. On December 2, 2018, I served an administrative

4    subpoena on the front desk clerk at the **Holiday Inn Express and Suites, 2515 196th St.**

5    **Southwest, Lynnwood, Washington**. Later that night, agents conducted surveillance of

6    KRISTOVICH at the **Holiday Inn Express and Suites**. Agents saw two males leave the

7    hotel and access one of KRISTOVICH's vehicles. After this, agents followed those two

8    males back to **Room 210** at the hotel. On December 3, 2018, management with the

9    **Holiday Inn Express and Suites** provided information pursuant to the subpoena

10   indicating Evan Dodge, a known associate of KRISTOVICH's, is renting **Room 210.**

11   Andrew KRISTOVICH is listed in the hotel records as an "accompanying person" in

12   **Room 210** with Dodge. Given this information, I believe KRISTOVICH has moved

13   from the last hotel he was residing in to the Holiday Inn Express and Suites in

14   Lynnwood, specifically to **Room 210.** I further believe Andrew KRISTOVICH is using

15   this room just as he have used his previous hotel rooms—to store drugs and drug

16   proceeds, and to conduct drug transactions.

17        110.   Through my training and experience, I recognize this type of behavior (the

18   frequent changing of locations) as being consistent with a drug trafficker attempting to

19   thwart the detection of law enforcement. I believe Andrew KRISTOVICH takes his

20   suspected drug enterprise to whatever dwelling he chooses (i.e., hotels located in the

21   Snohomish county area), in this instance, the **Holiday Inn Express and Suites, 2515**

22   **196th St. Southwest, Room 210, Lynnwood, Washington**.

23        111.   Andrew KRISTOVICH's criminal history consists of a 2012 misdemeanor

24   conviction for possession of marijuana/less that 40g (1 day jail), and a 2010 misdemeanor

25   conviction for disorderly conduct. He also has an active arrest warrant out of Walla

26   Walla (June 2018) for unlawful issuance of bank checks.

27

28

AFFIDAVIT OF JEREMY TAN - 39

## VIII.   TACTICS USED BY DRUG TRAFFICKERS

112.   Based upon my training, experience, and participation in this and other investigations involving narcotics trafficking, my conversations with other experienced investigators and law enforcement investigators with whom I work, and interviews of individuals who have been involved in the trafficking of methamphetamine, cocaine, oxycodone, fentanyl and other drugs, I have learned and know the following:

113.   Drug trafficking organizations often use "stash houses" to conceal their illegal activities and contraband. Such stash houses allow drug traffickers to keep their contraband at a hidden location, where they may not live, thereby making it more difficult for law enforcement and/or competitors to identify these locations where drugs and drug proceeds may be hidden.

114.   It is common for drug dealers to hide proceeds of illegal narcotics sales and records of illegal narcotics transactions in secure locations within their residences, stash houses, storage units, garages, outbuildings and/or vehicles on the property for their ready access and to conceal them from law enforcement authorities.

115.   It is common to find papers, letters, billings, documents, and other writings, which show ownership, dominion, and control of businesses, residences, and/or vehicles in the residences, stash houses, storage units, garages, outbuildings and/or vehicles of drug traffickers. Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the premises also include canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, keys, financial papers, rental receipts and property ownership papers, personal and business telephone and address books and telephone toll records, and other personal papers or identification cards in the names of subjects involved in the criminal activity being investigated.

116.   Drug traffickers frequently amass large proceeds from the illegal sale of controlled substances that they attempt to legitimize. To accomplish this goal, drug traffickers use financial institutions and their attendant services, securities, cashier's

1  checks, safe deposit boxes, money drafts, real estate, shell operations, and business

2  fronts.  Persons involved in drug trafficking and/or money laundering keep papers

3  relating to these activities for future reference, including federal and state tax records,

4  loan records, mortgages, deeds, titles, certificates of ownership, records regarding

5  investments and securities, safe deposit box rental records and keys, and photographs.  I

6  know from my training and experience that often items of value are concealed by persons

7  involved in large-scale drug trafficking inside of safes, lock boxes, and other secure

8  locations within their residences, outbuildings, and vehicles.

9       117.   Drug traffickers very often place assets in names other than their own to

10  avoid detection of these assets by government agencies, and even though these assets are

11  in other individual or business names, the drug dealers actually own and continue to use

12  these assets and exercise dominion and control over them.

13       118.   Drug traffickers often document aspects of their criminal conduct through

14  photographs or videos of themselves, their associates, their property, and their product.

15  Drug traffickers usually maintain these photographs or videos in their possession.

16       119.   Drug traffickers often maintain large amounts of US currency in order to

17  maintain and finance their ongoing illegal drug trafficking business.  Drug traffickers

18  from other countries operating in the United States frequently use wire remitters and bulk

19  cash transfers to transfer currency to co-conspirators living in other countries.

20       120.   Drug traffickers commonly have in their possession, on their person, and at

21  their residences and/or in their storage units, firearms and other weapons that are used to

22  protect and secure a drug trafficker's property.

23       121.   Drug traffickers use mobile electronic devices including cellular telephones

24  and other wireless communication devices to conduct their illegal trafficking business.

25  As described below, such equipment often contains evidence of these illegal activities.

26       122.   Traffickers of controlled substances commonly maintain addresses,

27  vehicles, or telephone numbers that reflect names, addresses, vehicles, and/or telephone

28  numbers of their suppliers, customers, and associates in the trafficking organization, and

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    it is common to find drug traffickers keeping records of said associates in cellular

2    telephones and other electronic devices.  Traffickers often maintain cellular telephones

3    for ready access to their clientele and to maintain their ongoing narcotics business.

4    Traffickers frequently change their cellular telephone numbers to avoid detection by law

5    enforcement, and it is common for traffickers to use more than one cellular telephone at

6    any one time.

7         123.    Drug traffickers use cellular telephones as a tool or instrumentality in

8    committing their criminal activity.  They use them to maintain contact with their

9    suppliers, distributors, and customers.  They prefer cellular telephones because, first, they

10   can be purchased without the location and personal information that landlines require.

11   Second, they can be easily carried to permit the user maximum flexibility in meeting

12   associates, avoiding police surveillance, and traveling to obtain or distribute drugs.

13   Third, they can be passed between members of a drug conspiracy to allow substitution

14   when one member leaves the area temporarily.  Since cellular phone use became

15   widespread, every drug dealer I have interacted with has used one or more cellular

16   telephones for his or her drug business.  I also know that it is common for drug traffickers

17   to retain in their possession phones that they previously used, but have discontinued

18   actively using, for their drug trafficking business.  Based on my training and experience,

19   the data maintained in a cellular telephone used by a drug dealer is evidence of a crime or

20   crimes.  This includes the following:

21        a.     The assigned number to the cellular telephone (known as the mobile

22             directory number or MDN), and/or the identifying telephone serial number

23             (Electronic Serial Number (ESN), Mobile Identification Number (MIN),

24             International Mobile Subscriber Identity (IMSI) number, or International Mobile

25             Equipment Identity (IMEI) number) are important evidence because they reveal

26             the service provider, allow agents to obtain subscriber information, and uniquely

27             identify the telephone.  This information can be used to obtain toll records, to

28             identify contacts by this telephone with other cellular telephones used by co-

conspirators, to identify other telephones used by the same subscriber or purchased as part of a package, and to confirm if the telephone was contacted by a cooperating source.

b.    The stored list of recent received calls and sent calls is important evidence. It identifies telephones recently in contact with the telephone user. This is valuable information in a drug investigation because it will identify telephones used by other members of the organization, such as suppliers, distributors and customers, and it confirms the date and time of contacts. If the user is under surveillance, it identifies what number he called during or around the time of a surveilled drug transaction or meeting. Even if a contact involves a telephone user not part of the conspiracy, the information is helpful (and thus is evidence) because it leads to friends and associates of the user who can identify the user, help locate the user, and provide information about the user. Identifying a defendant's law-abiding friends is often just as useful as identifying his drug-trafficking associates.

c.    Stored text messages are important evidence, similar to stored numbers. Agents can identify both drug associates, and friends of the user who likely have helpful information about the user, his location, and his activities.

d.    Photographs on a cellular telephone are evidence because they help identify the user, either through his or her own picture, or through pictures of friends, family, and associates that can identify the user. Pictures also identify associates likely to be members of the drug trafficking organization. Some drug traffickers photograph groups of associates, sometimes posing with weapons and showing identifiable gang signs. Also, digital photos often have embedded "geocode" information within them. Geocode information is typically the longitude and latitude where the photo was taken. Showing where the photo was taken can have evidentiary value. This location information is helpful because, for example, it

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    can show where coconspirators meet, where they travel, and where assets might be
2    located

3        e.     Stored address records are important evidence because they show the user's
4    close associates and family members, and they contain names and nicknames
5    connected to phone numbers that can be used to identify suspects.

6        124.   It is common for drug dealers to possess narcotics, drug paraphernalia, and
7    other items that are associated with the sale and use of controlled substances such as
8    scales, containers, cutting agents/substances, and packaging materials in their residences,
9    stash houses, storage units, garages, outbuildings and/or vehicles on their property.

10        125.   Drug traffickers commonly have in their possession, that is, on their person,
11    at their residences, stash houses, storage units, garages, outbuildings and/or vehicles,
12    firearms, and other weapons, which are used to protect and secure their property.

13        126.   Drug distributors frequently try to conceal their identities by using
14    fraudulent names and identification cards.  Once identities have been created or stolen
15    from other individuals, drug traffickers use those identifications to falsify records such as
16    DOL records and phone records to evade detection by law enforcement.

17        127.   It is a common practice for drug traffickers to maintain records relating to
18    their drug trafficking activities in their residences, stash houses, storage units, garages,
19    outbuildings and/or vehicles.  Because drug traffickers in many instances will "front"
20    (i.e., sell on consignment) controlled substances to their clients, or alternatively, will be
21    "fronted" these items from their suppliers, such record keeping is necessary to keep track
22    of amounts paid and owed, and such records will also be maintained close at hand so as
23    to readily ascertain current balances.  These records include "pay and owe" records to
24    show balances due for drugs sold in the past (pay) and for payments expected (owe) as to
25    the trafficker's suppliers and distributors, telephone and address listings of clients and
26    suppliers, and records of drug proceeds.  These records are commonly kept for an
27    extended period.

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   128.   Drug traffickers maintain books, records, receipts, notes, ledgers, airline

2   tickets, money orders, and other papers relating to the transportation and distribution of

3   controlled substances.   These documents, whether in physical or electronic form, are

4   maintained where the traffickers have ready access to them.   These documents include

5   travel records, receipts, airline tickets, auto rental agreements, invoices, and other

6   memorandum disclosing acquisition of assets and personal or business expenses.   I also

7   know that such records are frequently maintained in narcotics traffickers' residences,

8   stash houses, storage units, garages, outbuildings and/or vehicles.

9   **IX.   REQUEST FOR EARLY EXECUTION OF WARRANTS**

10   129.   Based upon physical and electronic surveillance observed by agents during

11   the course of this investigation, several members of the CASTRO DTO appear to have

12   employment that requires them to leave before or around 6 a.m. from their residences.

13   On December 3, 2018, the Honorable Theresa L. Fricke, United States Magistrate Judge,

14   issued 83 search warrants for locations (48) and vehicles (35) used by members of the

15   CASTRO DTO.   I requested, and was granted, authority to issue those warrants at 5 a.m.

16   I am also requesting authorization to serve this search warrant at 5 a.m. to ensure that

17   notice of the other warrants' execution does not reach KRISTOVICH before agents have

18   the opportunity to execute the instant warrant.   Additionally, it is safer for both agents

19   and suspects when agents execute such warrants in a preplanned tactical entry while the

20   suspects are asleep in bed, away from weapons.

21   **X.   CONCLUSION**

22   130.   On November 29, 2018, a grand jury sitting in the Western District of

23   Washington returned a sealed Indictment against 31 members of the CASTRO DTO,

24   *United States v. Carlos Eduardo Lopez Hernandez, et al.*, CR18-5579RBL, including

25   Andrew Cain KRISTOVICH.

26   131.   This Affidavit is submitted in support of an application to search the

27   **Holiday Inn Express and Suites, 2515 196th St. Southwest, Room 210, Lynnwood,**

28   **Washington**, more fully described in Attachment A.   Again, I am requesting permission

AFFIDAVIT OF JEREMY TAN - 45

1  to execute this search warrant prior to 6:00 a.m., in order to preserve evidence and ensure

2  the subjects of this investigation do not have the opportunity to flee from prosecution.

3  Based on intercepted communications and controlled purchases, such as those described

4  in this Affidavit, as well as continued physical and electronic surveillance, I believe the

5  location described in this Affidavit has been and will continue to be used by Andrew

6  Cain KRISTOVICH, a member of the CASTRO DTO, to further his drug trafficking and

7  related crimes in violation of Title 21, United States Code, Sections 841(a)(1), 843(b) and

8  846, and Title 18, United States Code, Sections 924(c), 1956, and 1957, and that evidence

9  of such, as described more particularly in Attachment B, will be found at this location.

10

11

12

13  JEREMY TAN
14  Special Agent
    Drug Enforcement Administration

15  SUBSCRIBED and SWORN TO before me this 4th day of December, 2018.

16

17

18  THERESA L. FRICKE
19  UNITED STATES MAGISTRATE
20  JUDGE

21

22

23

24

25

26

27

28

AFFIDAVIT OF JEREMY TAN - 46

1
2

**ATTACHMENT A**
**Location to be searched**

3
4
5
6
7
8
9
10
11
12
13
14

This warrant authorizes the government to search the **Holiday Inn Express and Suites, 2515 196th St. Southwest, Room 210, Lynnwood, Washington**, for evidence and/or fruits of the commission of the following crimes, as further described in Attachment B hereto:  distribution and possession with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1), and conspiracy to commit these offenses in violation of Title 21, United States Code, Section 846; use of a communications facility in furtherance of a felony drug offense in violation of Title 21, United States Code, Section 843(b); importation of controlled substances, in violation of Title 21, United States Code, Section 952; possession of a firearm in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c), and laundering of monetary instruments in violation of Title 18, United States Code, Sections 1956 and 1957.

15
16
17
18

The **Holiday Inn Express and Suites, 2515 196th St. Southwest, Lynnwood, Washington**, is a five-story building.  The rooms open to the interior of the hotel, and **Room 210** is on the second floor.  Hotel management will provide agents with a key to the room to prevent further damage to the property.

19
20
21
22

The search is to include all rooms within the residence, any assigned garages or storage rooms, attached or detached, and any vehicles found within such an assigned garage or in any assigned parking space.

23
24
25
26
27
28

AFFIDAVIT OF JEREMY TAN - 47

## ATTACHMENT B
### Items to be seized

From the location listed in Attachment A of this warrant, the government is authorized to search for and seize the following items, which are evidence and/or fruits of the commission of the following crimes:  distribution and possession with intent to distribute controlled substances in violation of Title 21, United States Code, Section 841(a)(1), and conspiracy to commit these offenses in violation of Title 21, United States Code, Section 846; use of a communications facility in furtherance of a felony drug offense in violation of Title 21, United States Code, Section 843(b); importation of controlled substances, in violation of Title 21, United States Code, Section 952; possession of firearms in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c); and laundering of monetary instruments in violation of Title 18, United States Code, Sections 1956 and 1957, including the following:

1) Any suspected controlled substances, for example, methamphetamine, fentanyl, and heroin;

2) Firearms and firearms-related items, including magazines, ammunition, holsters, and body armor, or other dangerous weapons;

3) Cellular telephones and other communications devices including iPhones, smartphones, flip phones, and similar devices, which may be searched only for the following items:

- Assigned telephone number and identifying serial number (e.g., ESN, MIN, IMSI, IMEI);
- Stored list of recent received, sent, or missed calls;
- Stored contact information;
- Stored photographs of narcotics, currency, guns or other weapons, suspected criminal activity, and/or the user of the phone or co-conspirators; and

AFFIDAVIT OF JEREMY TAN - 48

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1          • Stored text messages that relate to the above-enumerated federal crimes;

2      4)     Financial profits, proceeds and instrumentalities of trafficking in narcotics

3  and money laundering, including US currency and other items of value;

4      5)     Paraphernalia for packaging, smuggling, processing, diluting,

5  manufacturing, weighing, and distributing controlled substances, for example:  hidden

6  compartments, scales, blenders, funnels, sifters, grinders, glass panes, mirrors, razor

7  blades, plastic bags, heat sealing devices, and diluting agents such as inositol, vitamin

8  B12, etc.;

9      6)     Books, records, receipts, notes, ledgers, and other documents relating to the

10  distribution of controlled substances, money laundering, communications between

11  members of the conspiracy, and evidence of the use of apparently legitimate businesses to

12  disguise profits;

13      7)     Photographs, video tapes, digital cameras, and similar items depicting

14  friends and relatives of the property occupants, or suspected buyers or sellers of

15  controlled substances, controlled substances, and assets derived from the distribution of

16  controlled substances;

17      8)     Personal books and papers reflecting names, addresses, telephone numbers,

18  and other contact or identification data relating to the distribution of controlled

19  substances, and money laundering;

20      9)     Financial records relating to controlled substances income and expenditures

21  of money and wealth, to wit:  money orders, wire transfer records, cashier's checks and

22  receipts, bank account records, passbooks, tax records, safe deposit box keys and records,

23  checkbooks, and check registers, as well as precious metals and gems such as gold, silver,

24  diamonds, etc.;

25      10)    Items of personal property that tend to identify the person(s) in residence,

26  occupancy, control, or ownership of the premises and/or vehicle, including canceled mail,

27  deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility

28  and telephone bills, statements, identification documents, and keys;

AFFIDAVIT OF JEREMY TAN - 49

11)     Identification documents, including passports, visas, alien registration cards, any travel documents, immigration documents, driver's licenses, identification cards, and social security cards;

12)     Documents indicating travel in interstate and foreign commerce, to include airline tickets, notes and travel itineraries; airline schedules; gas receipts, bills; charge card receipts; hotel, motel, and car rental statements; correspondence with travel agencies and other travel related businesses; airline, rental car, and hotel frequent flier or user cards and statements; passports and visas; telephone bills; photographs of foreign locations; and papers relating to domestic and international travel; and

13)     Latent prints and identifying material from items at the residence.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800